`IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN
****************

PEOPLE OF THE VIRGIN ISLANDS, ) CASE NO. ST-2019-CR-00134
)
     Plaintiff, ) 14 V.I.C. §§ 2253(b), 2253(d)(2) (2 Counts)
 vs. ) 14 V.I.C. §§ 2253(e)(1), 2253(d)(2) & (9)
) 14 V.I.C. § 2253(a) (2 Counts)
LINARES A. WARRELL, ) 23 V.I.C. § 481(b)
) 14 V.I.C. §§ 2253(f) (5 Counts)
     Defendant. ) 14 V.I.C. § 2256(a) (2 Counts)
) 14 V.I.C. § 625(a)

Cite as: 2022 VI Super 59U

## MEMORANDUM OPINION

¶1 **THIS MATTER** is before the Court on:

1. Defendant's Motion For Suppression of Evidence ("Motion"), filed December 3, 2019; and

2. People's Response And Opposition To Defendant's Motion For Suppression of Evidence, filed November 17, 2020.

¶2 The Court will grant Defendant's motion and suppress the evidence because: (1) the "oral search warrant" was so facially invalid no reasonable officer would depend on it; (2) no valid search warrant was created until after the search and seizure had already taken place; and (3) the exclusionary rule and its purpose of deterrence should apply in the instant matter.

## I. INTRODUCTION / BACKGROUND INFORMATION

¶3 On May 27, 2019, Defendant Linares Warrell ("Warrell") returned to his home in the Solberg area of St. Thomas, U.S. Virgin Islands, when he was ambushed by two (2) men with guns. Surveillance footage shows that multiple rounds were fired at Warrell, some striking him, as he returned fire at his assailants at first with a handgun, and then with a high-powered rifle he retrieved from the trunk of his car. The footage shows Warrell, bloodied, entering his home with the firearms, and then exiting the home without the firearms but with his partner and several children, and entering another car. At around 3:56 a.m., Central Dispatch of the Virgin Islands Police Department ("VIPD") received a call from Roy Lester Schneider Hospital indicating a male had arrived with gunshot wounds.

¶4 VIPD conducted an investigation and arrested Warrell on May 28, 2019. Warrell was charged with fourteen (14) counts: 1) Two counts of Unauthorized Possession of a Machine Gun in violation of V.I. CODE ANN. tit. 14 §§ 2253(b), 2253(d)(2); 2) One count of Unauthorized

Possession of a Machine Gun and Conversion Kit in violation of 14 V.I.C. §§ 2253(e)(1), 2253(d)(2), 2253(d)(9); 3) Two counts of Unauthorized Possession of a Firearm in violation of 14 V.I.C. § 2253(a); 4) One count of Unauthorized Possession of a Firearm with Altered Identification Marks in violation of 23 V.IC. 481(b); 5) Five counts of Unauthorized Possession of a Firearm Within a Thousand Feet of a Private Youth Center in violation of 14 V.I.C. § 2253(f); 6) Two counts of Unauthorized Possession of Ammunition in violation of 14 V.I.C. § 2256(a); and 7) One count of Reckless Endangerment in the First Degree in violation of 14 V.I.C. § 625(a).

## A. Parties' Motion Arguments

¶5     Warrell moves for this Court to suppress "all evidence seized by officers of the Virgin Islands Police Department on or about May 27, 2019 from the premises located at or about 70-B Solberg, upstairs apartment, St. Thomas, U.S. Virgin Islands."[1] Warrell asserts that Sergeant Dwight A. Griffith ("Griffith"), the investigating officer, went to the Emergency Room at Roy Lester Schneider, spoke briefly with him, and that officers at that time and without authorization "confiscated and seized Defendant's keys from his trousers."[2] Warrell argues that Griffith "had no consent to search [his] clothing or to remove any items," that Griffith had "no warrant and no probable cause" to believe there was evidence of a crime or contraband, and that Warrell was not arrested at this time but was instead a victim.[3]

¶6     Warrell asserts that Griffith and other officers went to 70-B Solberg and viewed video footage of the incident, and then "disabled the property's cameras which would have otherwise provided incontrovertible video evidence of the exact time and manner that the officers entered the second floor apartment."[4] Warrell states that his girlfriend was the legal leaseholder of the apartment and she did not consent to a search of her apartment; the apartment was searched three (3) hours prior to calling for a search warrant; and during the initial search officers allegedly obtained two (2) Glock handguns, a Beretta handgun, 2 "ghost" rifles with obliterated serial numbers, and an AR-15 semi-automatic Omni rifle.[5]

¶7     Warrell contention that his Fourth Amendment rights were violated by the warrantless search of his apartment and the exclusionary rule is appropriate here. Warrell states that even if law enforcement did obtain a warrant, they obtained that warrant at approximately 1:30 p.m. and that Griffith had met with Warrell at 4:08 a.m. According to Warrell, when his girlfriend returned between 10:00 am and 11:30 am, she needed to ask the landlady to open the apartment and she discovered "obvious signs of a police search, including evident disarray and the removal of several personal items from the premises."[6]

---

[1] Def.'s Mot. 1.
[2] Def.'s Mot. 2.
[3] Def.'s Mot. 2.
[4] Def.'s Mot. 2.
[5] Def.'s Mot. 3.
[6] Def.'s Mot. 5.

¶8      Warrell also argues that there was no recognized exception to the warrant requirement based upon exigent circumstances in this case. Warrell was the victim of a crime and not an instigator; he was not under arrest; he was hospitalized and thus posed no threat of returning to the residence to destroy evidence; the officers had no basis to believe the premises were occupied; and finally, there was clearly no impediment to receiving a warrant because one was eventually received. Warrell contends that no evidence was collected after the warrant was received, as this "was used solely to 'cure' the warrantless entry into the property" and that "[t]his stratagem attempts to make the judicial system the unwitting accomplice in violation" of Warrell's rights.

¶9      The People respond that Griffith reviewed the surveillance footage system with the landlady and a representative from the Digital Protection Company and "[a]t no time did Sgt. Griffith or other VIPD personnel have access to or even touch the security surveillance system."[7] The People state that after VIPD viewed the video, Griffith applied for a telephonic warrant that was issued at 1:30 pm on May 27, 2019, and then searched the defendant's apartment at 2:07 pm. The People assert that Warrell's motion is flawed because of "gross factual inaccuracies."[8] The first inaccuracy the People claim that Warrell asserts is that "Sgt. Griffith tricked Judge Dunston into issuing the telephonic warrant."[9] Second, the People state that Warrell "misrepresents that the police entered his apartment prior to issuance of the telephonic warrant."

¶10     The People state that Warrell's keys and other personal items were "retrieved at the hospital by [a] nurse" and then "given to Crime Scene Technician ["CST"] Aneaca David" at 8:39 am and that Griffith was on the scene at 8:39 am. The People deny that officers deleted surveillance footage and they deny that officers entered the house before the warrant was obtained.[10] The People argue that the search was presumptively reasonable because it was conducted pursuant to a warrant.[11] The People then argue that, even assuming all the allegations of police misconduct are true, it would not be enough to invalidate the warrant as the warrant was issued off the events depicted in the surveillance video and the "independent source doctrine" cures any defect from a prior illegal search.[12] The People also assert that exigent circumstances were present because, after viewing the surveillance video and securing the scene, how were "the police supposed to know who in is in that apartment with those firearms and what they may be planning to do?"[13] Therefore, the People argue the warrantless entry of the apartment was justified for police safety.[14]

---

[7] People's Opp'n 1-2.
[8] People's Opp'n 3.
[9] People's Opp'n 3.
[10] People's Opp'n 4.
[11] People's Opp'n 5-6.
[12] People's Opp'n 8-10.
[13] People's Opp'n 10.
[14] People's Opp'n 11.

## B. The Suppression Hearing

¶11    In light of Warrell's motion, this Court held a suppression hearing on March 22, 2022.[15] At the hearing, the People reiterated their position that the search was made pursuant to a valid warrant and the burden remains on Warrell to show that it was improper.

### 1. Sergeant Griffith's Testimony

¶12    The People 's first witness, Sgt. Griffith, testified that there had been a shooting, that he made contact with the owner of the complex, and that he sat down with the owner and a representative from a video surveillance company who uploaded the video of the shooting onto a jump drive. Griffith then testified that he advised the VIPD Chief of Police and called the Attorney General's office so he could apply for a telephonic warrant. Griffith stated he spoke with a Judge, and he cannot remember what he was asked on the phone, but after speaking with the Judge the warrant was granted. Griffith also testified that Detective Nigel James was with him. Griffith stated that Assistant Attorney General Timothy Perry assisted him in preparing a written version of the warrant which was completed the next day.

¶13    Griffith also identified the video from the jump drive, which was admitted into evidence and played for the Court. The video shows Warrell returning home in his car. As Warrell exits the car, an individual off-camera in the bushes to the left side of the video and individual at the end of driveway shoot at him. Warrell returns fire with a handgun and is shot, he then retrieves a rifle from the trunk of his car and walks down the driveway, where one of the assailants drops his handgun and flees. A now bloodied Warrell then enters the house with his handgun and rifle. Subsequently, Warrell, his girlfriend, and several children leave the house and enter another car at the end of the driveway. As Warrell's girlfriend assists him in entering the car, one of the older children, approximately fourteen (14) years in age, retrieves the handgun that was dropped at the end of the driveway and runs it into the house before returning back to the car and the car pulling away.

¶14    Griffith testified to a series of photos taken of the crime scene, which show the crime scene secured and blocked off with police tape along with various evidence markers out. Griffith testified these photos were taken before the search warrant was issued. Griffith also stated that he never left the crime scene until everything was over with. Griffith revealed that after he received the telephonic warrant, he called in more detectives because he needed "extra manpower" to conduct the search and that they conducted the search at 2:07 pm. Griffith also testified that the officers knew from the surveillance video that one of the guns used in the shooting had been picked up by a minor and put in the apartment and that they knew "there was a key piece of evidence upstairs in the apartment that would at least assist us in helping to see who it is shot after Mr. Warrell. Because, at the beginning of the case he was technically a victim. He was not a suspect."

---

[15] Due to the ongoing COVID-19 pandemic, the hearing was continued several times.

¶15     On cross-examination, Griffith testified that he did not see the warrant, as it was telephonic, but he knew the contents of it based on what the Judge told him. When asked if at that time whether Warrell was the "target of any investigation," Griffith stated that Warrell was not under investigation and VIPD just wanted to know "who it was that had shot at Mr. Warrell." Griffith also stated he had "no information at that time Mr. Warrell committed any offense." Griffith also testified that the search warrant did not mention any specific crime, and on its surface it just states it is for "a firearm" and items related to that firearm "as previously described," although Griffith admits there is no previous description on the face of the warrant, as he was the one who described it to the Judge over the phone.

¶16     On cross-examination, Griffith confirms that while the warrant states there was an affidavit presented, no affidavit was written until after the search was executed. Defense counsel then went through the sixty-four (64) items seized during the search, and Griffith confirms that "well over half" were not seized pursuant to the warrant or what was described on the warrant. Griffith stated he did not exactly remember what he had told the Judge after reviewing the surveillance video, and that while the warrant only states they were after "a weapon . . . that does not mean that's the only weapon."

¶17     Griffith also reaffirmed his testimony that he stayed at the Solberg site throughout the night and early morning hours until the search warrant was served. Griffith confirmed his individual police code number is "52." He also confirmed any entry of "52" in the Virgin Islands Territorial Emergency Management Agency call history record would be a reference to him. Griffith then testified that once he "left Mr. Warrell at the hospital and went to the crime scene" and that is where he stayed. Griffith was then confronted with the call history record of the Virgin Islands Territorial Emergency Management Agency, which shows Unit 52 arriving at Solberg at 4:49:11 am, as well as Unit 52 leaving Solberg for the hospital at 10:37:23 am along with "Unit 51-b" and "India." Griffith again denied that he left and stated it must be an error, although he admitted he had a chance to review those documents.

¶18     Griffith testified that the first time he saw the written warrant was the following day, and that he did not, by recording, taking notes, or any other method put down what he understood he was allowed to do "based on the oral warrant that was given to [him]." Griffith testified that no one else heard his conversation with the Judge while he was on the phone, that he was actually in his police car, and the only other person around would have been the detective standing outside the car. Griffith also testified that he could not recall whether he was placed under oath during the request for the telephonic warrant. Griffith finished his cross-examination and testimony by stating that Warrell is still considered a victim as the assault case against him is still open as VIPD has not been able to identify the shooters against him, and that he is unaware if any casing shells from the scene were sent to "NIBIN" (the National Integrated Ballistic Information Network).

### 2. Evelyn Hairston's Testimony

¶19 Warrell then called the landlady, Ms. Evelyn Boschulte Hairston ("Hairston"). Hairston testified that early in the morning at daylight, VIPD, including Griffith, knocked on her door to ask if they could see the cameras. Hairston testified that she and a representative from the surveillance company and the officers watched the video, and Griffith asked for a copy to be made, and the whole event took about ten (10) minutes. Hairston testified that she observed officers around in the yard, that she could not recall if she saw any on the stairs, that she "guess[es] they went upstairs," and when asked whether she "saw the officers either going in and out of the apartment" she replied "yes, they may have." Hairston was not certain as to what time exactly the officers were entering the apartment but when asked whether it was in the morning or afternoon she stated "[i]t was in the morning."

¶20 Lastly, Hairston also testified that Warrell's girlfriend, Dalila Jerez ("Jerez"), knocked on her door that same day to ask to be let into the apartment. She further stated that Jerez "might have told [her] that she didn't have her key; that [VIPD] had the key" and that VIPD never indicated to Hairston that they might have an apartment key.

### 3. Dalila Jerez's Testimony

¶21 The last witness called by Warrell was his girlfriend, Jerez. Jerez testified she lived in the apartment for two (2) years with her children and Warrell. Jerez testified that as of 2022, her children were ages eighteen (18), twelve (12), and three (3). Jerez then testified that on the night of the shooting, she had been sleeping when she heard a lot of gunshots, she then gathered her children and hid them under a bed until the shooting stopped, at which point she hears Warrell call for her and she sees that he is covered in blood. She stated that once she saw Warrell bleeding, she picked up her small baby and got her other children so they could drive to the hospital.

¶22 Jerez stated next that on the way to her car she remembered seeing a gun in the driveway. Jerez testified it was in the middle of the driveway by the side of her car. Jerez testified that after taking Warrell and staying at the hospital, her baby needed milk and all the children needed clothes as they ran out in only t-shirts, so she returned to the home sometime between 4:00 a.m. and 5:00 a.m., although she was prevented by Griffith from entering the house. Jerez stated that Griffith would call her when it was okay to return, but she never received a call, so she later returned to the home with a policewoman named "Kim."

¶23 Jerez then said she had to go to the landlady to get a key, because Warrell had her key when he was out that night, and when Forensics removed items from Warrell's pants, they gave her the money and "everything except the key." Jerez testified that she told the forensic officer to "give [her] the key because that's the key for [her] house" but the Officer said "no she going to give the key to her superior" so therefore she needed the landlady to open the house. Jerez clarified that the forensic officer said that "she going give the key to her superior, Griffith." Jerez then stated when she went to her landlady the landlady asked her "why [Jerez] give the key – my key to them." Jerez

says she stated "I say the police were in there already, open the door and thing. So I tell her I no give my key to nobody, they take the key."

¶24    After borrowing the landlady's key, Jerez testified she entered the house that morning and "[t]he house was a mess. My couch was like mash up. The cabinet open, the fridge – I have a picture with me and [Warrell] and my son on the fridge, they take it out," that the drawer was open, the bed and her mattress were a mess, the children's mattresses and rooms were a mess, and that the apartment looked nothing like when she left for the hospital because she "left everything good."

¶25    On cross-examination, Jerez testified that she knew Warrell for fourteen (14) years, had children by him, and that they used to have two (2) keys for the house but Warrell lost one. She also testified that she did not see her son pick up the gun because she was more concerned with getting to the hospital. Jerez stated she knew forensics had the key because she was in the room when they cut the pants leg off Warrell, the nurse asked to whom he would like the items in it to go, and Warrell indicated Jerez. Jerez further stated the nurse counted out the money and handed it to her but would not give her the key, and she still has never received that key back.

### 4. Griffith's Testimony Re: the cash in the brown paper bag

¶26    The rest of the hearing concerned a sum of cash seized by VIPD from Warrell's home. Griffith returned to the stand to testify. Griffith testified that as lead investigator he signed the inventory return for the search warrant and was responsible for making sure the inventory return was complete. Griffith testified that he knew money was seized, but not how much it was. The People clarified $18,900.00 in cash was seized during the search and it is now in a brown paper bag in police custody. Another officer on the inventory return had written the amount out as a series of smaller multiples on the form. Griffith stated that "the way it was written and the way it was calculated . . . was different."

¶27    Griffith further testified that he was not aware from May 2019 until the week before the hearing of the discrepancy between the amount of money on the inventory return and the amount actually in the evidence room. Griffith stated he was not aware, even though he was present in the apartment during the search, of how much money was seized. Griffith then stated he did not compute, but took verbatim what the officer had put on the property forms and transferred it to the supplemental forms. The property form indicates that "Ninety-Five (95) $20 dollar bills Total $1,900.00 from a Gucci box in the closet master bedroom" was found. Griffith testified that he was not told that roughly $20,000 was actually discovered and that "it depends" whether it was unusual that he was not told that and he has found more money on a gun search before. Griffith also testified that the Forensics Unit is responsible for documenting all the evidence recovered.

### 5. Warrell's Closing Argument

¶28    Warrell reiterates his position that the search of his apartment violated his Fourth Amendment right as he maintains the search was conducted prior to the issuance of the telephonic search warrant. Warrell argues that considering Virgin Islands Rule of Criminal Procedure 41 in

conjunction with Rule 4.1, it is "abundantly clear that what occurred with respect to the 'Search Warrant' was facially defective" to such a degree that no experienced law enforcement could believe there was a 'good faith' reliance on the warrant. Warrell argues that Griffith could not testify whether or not he was sworn when he recited the facts to the judge, nor could he articulate what the warrant permitted him and other law enforcement officers to seize.

¶29    Warrell also points out that Griffith admitted that many of the items seized, such as jewelry, passports, driver's licenses, etc., exceeded the scope of the warrant. Warrell states that the items seized from his car also exceeded the scope of the warrant, the car was immobile, and therefore it was not subject to the *Carroll* Doctrine. Law enforcement, Warrell argues, lacked a warrant or exigent circumstances to enter the car, and all "unlawful weapons" had already been removed from the car according to the post-search affidavit. Warrell cites to the District Court of the Virgin Islands case *United States v. Mejia*,[16] where the District Court suppressed items seized from a car because the warrant did not sufficiently comply with the procedures of Federal Rule of Criminal Procedure 41, which is analogous to the Virgin Islands rule, and the good faith exception did not apply because the warrant was so facially deficient.[17]

¶30    Warrell points out the written warrant issued the following day likewise failed to indicate whether Griffith was placed under oath. Warrell also highlights that Griffith did not have a copy of the warrant transmitted to him by reliable electronic means nor did he have a copy of the warrant that would allow him to sign the judge's name if so directed by the judge. Warrell further points out the following requirements of Rule 4.1 were not met: 1) The testimony of Griffith had to be under oath, there is no indication from his testimony or on the face of the warrant he was; 2) There is no showing the judge had testimony recorded verbatim by an electronic recording device, a court reporter, or in writing; 3) There was no transcription of Griffith's statements, no certification of the accuracy of the transcript, and no filing of the transcript; 4) If any exhibits were used, they were not filed; 5) No proposed duplicate warrant was prepared by Griffith and read to the judge verbatim; 6) There was no transmission to the judge of the proposed warrant; 7) There was no signing and transmission of the warrant by the judge and subsequent transmittal to the applicant; 8) There was no cotemporaneous execution of any document prior to entry and the judge was required to "sign the original document;" 9) The judge did not enter the date and time on the warrant prior to the entry; and 10) The judge did not transmit the warrant to Griffith or give him direction to sign his name and enter the date and time on the warrant.

¶31    Warrell states that not only were none of these procedures followed, but the evidence only showed that Griffith talked to the Judge, allegedly got permission to search the home for "a weapon," and the search commenced. Further, Warrell argues that the search went "[f]ar beyond what even Det. Griffith admits he was allowed to search for[—]a firearm ammunition, and documentation concerning ownership of any firearms found within the Defendant's residence."[18] Warrell argues that simply because there is a procedure to get a warrant over the telephone does

---

[16] No. 2011-35, 2016 U.S. Dist. LEXIS 172575 (D.V.I. Dec. 10, 2016) (unreported opinion).
[17] *Id.* at *26.
[18] Def.'s Closing Argument Regarding The Mot. To Suppress Evidence 6.

not mean the Fourth Amendment can be completely disregarded for the convenience of law enforcement. Warrell argues that the manner of securing a telephonic warrant requires more than just a phone call, and that the disregard for the Rule and the "laissez-faire manner in which this warrant was obtained reeks with bad faith, sloppiness, and a blatant disregard for the rules."[19]

¶32    Warrell argues that regardless of whether the search occurred in the morning, as witnesses testified, or after the phone call, "what resulted was a wholesale dismantling of the Defendant's residence and the seizure of items that are not even arguably within the scope of the warrant" and it looked more like a "tornado had blown through the door."[20] Warrell also argues that the crime scene photos of the police tape and testimony show there was no exigent circumstance or concern for destruction of evidence since law enforcement had secured the scene since approximately 4:00 a.m. that morning. Lastly, Warrell argues that the testimony from two witnesses, one of whom has no interest in the outcome of this case and had assisted the police, clearly show that law enforcement had entered the property without a warrant.

### 6. People's Closing Argument

¶33    The People argue that nothing in Virgin Islands Rule of Criminal Procedure 4.1 states a timeframe for when the supporting paperwork needs to be filed. The People argue that Warrell's argument involves "three broad factual inaccuracies" which they previously mentioned in their prior motion, namely their allegation that Warrell is stating that Griffith "tricked" the Judge and that it is factually inaccurate that the police entered the apartment prior to the warrant. The People then add that Warrell "delves into factual inaccuracies and misinterpretations" of the Virgin Islands Rule of Criminal Procedure.

¶34    The People argue that Griffith testified "credibly" that the search did not begin until after the issuance of a warrant while Warrell offered two (2) "highly biased" witnesses. While Warrell argues the landlady Hairston has no interest in the outcome of the case, the People argue she may be afraid of Warrell since he is "heavily armed," that Hairston directly benefitted from Warrell's "ill-gotten gains" since she was his landlady, and it would benefit her childcare business for the "attendant negative publicity" around this case to go away. The People then argue that Jerez's testimony is "worthless" as she has "an obvious interest in trying to prevent the father of her children from going to prison."

¶35    The People then point out that the warrant was annotated to say that the information was "previously conveyed by telephone under oath" to show that although Griffith could not remember if he was under oath on the stand, he must have been as the note in the margins so states. The People then argue that Rule 4.1(c) only allows for suppression if there has been a finding of bad faith, and neither Griffith nor the judge who issued the warrant had any bad faith. The People state that since the apartment was searched with a warrant it was presumptively reasonable. Because it was presumptively reasonable, they argue, Warrell must demonstrate that Griffith knowingly, or

---

[19] Def.'s Closing Argument Regarding The Mot. To Suppress Evidence 7.
[20] Def.'s Closing Argument Regarding The Mot. To Suppress Evidence 7.

with a reckless disregard for the truth, made false statements or material omissions in the underlying affidavit. The People contend Griffith did not, but rather submitted information he gleaned from the surveillance video and it is that information, as relayed by Griffith, upon which probable cause was found.

¶36    The People then argue again that even if the allegations of police misconduct are true, they would not be enough to invalidate the search because the warrant is based on events independent of the search of the apartment. The People cite to *Browne v. People*,[21] where a secondary search conducted after a prior illegal search and after a warrant was obtained was deemed acceptable because of the "independent source doctrine." The Court did not apply the exclusionary rule because "the illegal entry and seizure 'did not contribute in any way to discovery of the evidence seized under the warrant.'"[22] The People argue that because there was an independent source, the surveillance video, the evidence should not be suppressed. In the alternative, the People reargue that exigent circumstances exist because VIPD did not know who was in the apartment and what they might be planning on doing with the firearms.

¶37    Warrell objected to factual assertions the People made which were based on items contained in an "Affidavit for Search Warrant" and in a CD labeled "People's 2nd Supplemental Discovery Surveillance" because all counsel were allegedly not supplied with these items and Warrell argues that consideration would violate his right to effective assistance of counsel and due process of law.

### 7.  Warrell's Sur-response

¶38    On May 27, 2022, Warrell filed a Motion For Leave Of Court To File Defendant's Sur-rebuttal Closing Argument And To Exceed The 20 Page Limitation, which the Court granted that day. Warrell states the warrant is unconstitutionally vague and lacking in particularity, and that the mishandling of obtaining the warrant and its overbreadth all constitute grounds for suppression. Warrell argues there was no valid reason for a written affidavit to not be prepared and submitted to the Judge as law enforcement was in full control of the premises. Warrell argues there can be no "good faith" exception under the caselaw and in light of Griffith's involvement in other cases where warrantless searches of apartments resulted in suppression, namely *Thomas v. People*.[23]

¶39    Warrell argues that this shows a "pattern of illegal activity" that "compels this Court's ruling that law enforcement was not acting in good faith" and that the only way "law enforcement can learn from their mistakes" is to "suppress the fruits of the poisonous tree" including all evidence taken from the apartment, curtilage, and car of Warrell. Warrell argues that the officers either elected to not follow the law, or failed to know the law, and he cites to *United States v. Leary*[24] for the proposition that "[a] reasonably well-trained officer should know that a warrant

---

[21] 56 V.I. 207 (V.I. 2012).

[22] *Id.* at 219.

[23] 63 V.I. 595 (V.I. 2015) (where evidence was suppressed when the police validly entered an apartment under exigent circumstances, but then proceeded to search the apartment after those circumstances dissipated).

[24] 846 F.2d 592 (10th Cir. 1988).

must provide guidelines for determining what evidence may be seized."[25] Warrell cites to the Third Circuit, arguing it addresses why the exclusionary rule should apply here: "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful or at the very least negligent, conduct which has deprived the defendant of some right. By excluding evidence seized as a result of an unconstitutional search and seizure the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused."[26]

¶40    Warrell then argues that a good faith exception cannot stand when a warrant is facially overbroad with no guidelines as to what can and cannot be taken. Warrell cites to *Voss v. Bergsgaard*,[27] where the Tenth Circuit stated "[t]he insufficient particularity of the warrants . . . is . . . illustrated by some of the items actually seized . . . . The warrants . . . allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the fourth amendment proscribes."[28] Warrell states the lack of the good faith exception from this lack of particularity is underscored by *Leary*, where the extent of the search and seizure of multiple personal items provided further evidence that the warrant was unreasonable:

> Nevertheless the search and seizure of Leary's personal papers and information unrelated to the export business was beyond the terms of the warrant supporting the district court's conclusion that the government executed a prohibited general search of the Kleinberg premises . . . . The manner of execution provides additional evidence that the search was "unreasonable" and contrary to the fourth amendment.[29]

¶41    Warrell additionally argues that since the affidavit was not completed until the next day, the prosecution should not be able to rely on information contained within the affidavit to "resurrect" the invalid warrant. This is particularly the case, Warrell argues, because he was not provided with any supporting documents, including the warrant, prior to the search of his home. Warrell also argues that clearly there was no clerical error exception, and that no exigency can be claimed because it can be seen that all the occupants of the apartment were leaving with Warrell to the hospital.

¶42    Warrell argues that the Judge failed to perform his duties as no warrant was signed by the Judge and transmitted back to Griffith before the search nor did the Judge direct Griffith to sign the warrant. Indeed, the Judge could not because no warrant was in existence. Warrell states that since there is no record of the conversation between Griffith and the Judge, there is no record that can address the indicia of probable cause, and this lack of recording also violates Warrell's Fifth

---

[25] *Id.* at 609.

[26] *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002) (internal quotations and citations omitted).

[27] 774 F.2d 402 (10th Cir. 1985).

[28] *Id.* at 405.

[29] *Leary*, 846 F.2d at 605 n.23.

and Sixth Amendment rights as counsel could not cross-examine what was purportedly said during that conversation, depriving Warrell of Due Process and Effective Assistance of Counsel rights.

¶43    Further, Warrell argues that a cursory reading of the search warrant shows it to be deficient as it fails to state what offense occurred related to the defendant, the warrant was overbroad and vague by failing to particularize what was to be seized, and the judge abandoned his neutral and detached functions. Warrell cites to *United States v. George*[30] for the proposition that "a warrant not limited in scope to *any crime at all* is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise."[31] *George* further held that a warrant which just listed certain items to be seized, and "[n]othing on the face of the warrant tells the searching officer for what crime the search is being undertaken" was a general warrant and invalid.[32] Warrell argues that in the instant case, there was not even a related document like an affidavit "that could be claimed to limit the scope." Warrell, citing again to *Thomas v. People*, states that the government has the burden of showing good faith reliance, and that burden is "showing that the error was harmless beyond a reasonable doubt."[33]

¶44    Warrell then moves to an analysis of the District Court of the Virgin Islands decision in *United States v. Merchant*,[34] in which Chief Judge Lewis expounded on the purpose of the particularity requirement, stating that it is to prevent general exploratory searches "as well as to 'assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.'"[35] The description must be such that a searching officer can "ascertain and identify the place intended" and must "describe[] the items to be seized."[36] Warrell points out that in *Thomas*, like in the instant case, all of the residents of the property were on their way to the hospital and there was ample time to obtain a valid search warrant, so the evidence seized in this case should be suppressed. As the V.I. Supreme Court held in *Thomas*:

> Hence, all of the evidence obtained after Blyden was removed from his apartment and Thomas left to go to the hospital should have been suppressed because the VIPD never obtained a search warrant and no valid exception to the warrant requirement existed. When evidence is obtained as a result of an unconstitutional search, the exclusionary rule **609 requires that the fruits of that search be excluded from evidence at trial. This unconstitutionally obtained evidence includes all of the photographs taken of the crime scene, Detective Smith's testimony on what she observed in and around the house, *see Simmonds*, 53 V.I. at 556 (observing that "[t]he Fourth Amendment's shield from unreasonable government

---

[30] 975 F.2d 72 (2d Cir. 1992).

[31] *Id.* at 77.

[32] 975 F.2d at 76.

[33] 63 V.I. at 612

[34] No. 2018-0017, 2019 U.S. Dist. LEXIS 143457 (D.V.I. Aug. 23, 2019).

[35] *Id.* at *15-16 (quoting *Groh v. Ramirez*, 540 U.S. 551, 561 (2004)).

[36] *Id.* at *16.

intrusion ... extends to the curtilage"), her observations regarding the gun, and any physical evidence obtained from the house, including the gun itself since it was seized during Detective Smith's illegal search.[37]

¶45    Warrell then points to the Montana District Court case *United States v. Evans*,[38] where a judge signed a search warrant application and affidavit, but not the search warrant itself. The court there held that it was not objectively reasonable for the officers to believe the unsigned search warrant was valid, and in effect the unsigned search warrant was no better than a blank paper, and thus the search violated the defendant's Fourth Amendment rights.

¶46    Warrell counters the People's argument that he was in a "violent shootout," stating instead that the video and testimony at trial show that he was defending himself against "an onslaught of at least two individuals armed with semi-automatic and potentially other firearms." Warrell points out that the record is clear that he was first struck with a bullet, and then shot back in self-defense. Warrell states that the People argue without evidence that the shootout took place "within a thousand feet of a preschool," and that if this evidence had been presented at the hearing, Warrell would have "been easily able to establish that the school had not been in operation for over a year" by asking the landlady and school owner. Warrell also argues that the People state that he directed a minor to pick up a firearm and that there was no proof or evidence that Warrell gave the minor any such instruction.

¶47    Warrell then takes contention with the People's assertion that a telephonic warrant was issued at 1:30 pm on May 27, 2019, asserting instead that an incomplete, and therefore null and invalid warrant, was issued the following day. Warrell then goes through how the warrant was deficient under Rule 4.1 such as the judge must take testimony under oath and Griffith could not recall if he was under oath. Warrell argues that since the warrant was not provided until the following day, that means "there was no attempt to provide sufficient direction by the court to the law enforcement officers who actually conducted the search," and the warrant on its face gives no guidance as to what could or could not be seized, thus the particularity requirement has not been met.

¶48    Warrell cites to *Groh v. Ramirez*[39] for the proposition that "the mere fact that the Magistrate had issued a warrant did not necessarily establish that he had agreed that the scope of the search should be as broad as the affiant's request."[40] The warrant is further lacking in particularity, Warrell argues, because it describes a "firearm, as previously described," without stating what was previously described. Additionally, Warrell argues that the warrant does not explain what crime officers are investigating. Thus, Warrell argues, the warrant authorizes a "general search" in violation of the particularity requirement. Warrell again cites to *Groh*, where the U.S. Supreme Court found it was unreasonable to proceed with a search when the officer did not have in his

---

[37] *Thomas v. People*, 63 V.I. 595, 608–09 (V.I. 2015).

[38] 469 F. Supp. 2d 893 (D. Mont. 2007).

[39] 540 U.S. 551 (2004).

[40] *Id.* at 561.

possession a warrant particularly describing the things to be seized, and here Griffith did not have a warrant in his possession until the following day, and that warrant was defective.

¶49     Warrell next argues that none of the requirements of subsection (2) of Rule 4.1 were met, as there was no record of the testimony or exhibits created, certified as accurate, and filed. Warrell points out that no proposed warrant was prepared and its contents were not read or otherwise transmitted verbatim to the judge, and that the rule states that the applicant *must* do this. Warrell states it is clear from Griffith's testimony that he did not have a warrant in his possession before entering, and that the judge was not provided a warrant nor did he sign a warrant prior to the search. Warrell argues that Griffith put his credibility and experience on the line when he stated that it is his training and experience that provided him with the probable cause to search the apartment, and that the same training and experience should have indicated to him the warrant was deficient.

¶50     Warrell then cites to *People v. John*[41] where the Supreme Court of the Virgin Islands affirmed the suppression of notebooks seized during a search of a teacher's house, who was accused of molesting students, partially for the reason that the officer had failed to establish a basis for probable cause that the defendant was engaged in child pornography. This lack of probable cause meant the officer could not rely on the good faith exception to the warrant requirement, and Warrell argues that same lack of probable cause here should mean Griffith cannot rely on the good faith exception. Warrell underscores this point by citing *Thomas v. People*,[42] a case involving Griffith and another alleged illegal search, in which the Supreme Court of the Virgin Islands affirmed the suppression of the evidence as Griffith entered and searched the scene after the "rendering aid" exigency permitting other officers into the apartment ceased. Warrell states that a finding that there can be no good faith reliance is further strengthened by the sheer scope of items taken that were not firearms or ammunition, including social security cards, passports, keys, money, and so forth.

¶51     Warrell also pushes back on the People's assertion that his landlady "directly benefitted from Defendant's ill-gotten gains" stating there was no evidence or testimony that Hairston benefitted other than in being a landlady, nor was there any testimony or evidence of Warrell engaging in illegal activity nor does the affidavit allege any illegal activity of an income producing nature. Warrell also pushes back on the People's assertion that by attacking Griffith's recollection of what he discussed with the Judge and the failure of Griffith to read or transmit a proposed search warrant to the Judge, he is "attacking the judge." Warrell additionally argues that the Judge's handwritten notation on the warrant the next day cannot cure the non-existence of a written warrant at the time of the search.

¶52     Warrell also argues that a search warrant was easily obtainable in this case as the scene was already secured by law enforcement and officers knew that the residents had left, again citing to *Thomas* where the Virgin Islands Supreme Court stated that the failure to obtain a warrant was especially egregious "given the fact that the VIPD had fully secured Thomas apartment, and thus

[41] 52 V.I. 247 (2009).
[42] 63 V.I. 595 (2015).

had ample time to obtain a search warrant."[43] Warrell also argues the warrant is deficient in not naming the crime, citing to the Tenth Circuit case *United States v. Suggs*[44] where a warrant was found invalid because it did not reference any particular crime or firearm-related offense, as well as the Second Circuit case of *United States v. George*,[45] as the evidence named in the warrant in that case "egregiously" was not linked to a particular crime.[46]

¶53     Warrell then argues that the failure of the affidavits to accompany the warrant invalidates it, citing to *Merchant*, where a warrant was found invalid because incorporated affidavits were not properly accompanied with the warrant.[47] Thus, Warrell argues, the particularity requirement has not been met because the warrant does not find probable cause for a particular crime, does not state with particularity the nature of the firearm and its parts, there was no incorporation of the affidavits, and a warrant cannot incorporate an affidavit merely by mentioning it. Warrell points out that Griffith testified he did not serve the warrant on Warrell nor did he leave an inventory of what was seized. Therefore, the very purpose of the Fourth Amendment warrant requirement, "to inform the executing officer as to what he can seize and to notify the person whose property is being searched that the officer had the right to serve the warrant and a list of what was to be seized," was wholly ignored here and the evidence should be suppressed.[48]

## II.     LEGAL STANDARD

¶54     The Fourth Amendment of the United States Constitution protects a person's right to be free from unreasonable searches or seizures:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[49]

¶55     This amendment is made applicable to the territory of the United States Virgin Islands through the Revised Organic Act of 1954, § 3.[50] A search conducted without a warrant is presumptively unreasonable.[51] Unreasonable searches and seizures done in violation of this Fourth Amendment right may result in application of the "exclusionary rule," where illegally obtained

---

[43] *Thomas*, 63 V.I. at 608.

[44] 998 F.3d 1125 (10th Cir. 2021).

[45] 975 F.2d 72 (2d Cir. 1992).

[46] *Id.* at 78.

[47] No. 2018-0017, 2019 U.S. Dist. LEXIS 143457 (D.V.I. Aug. 23, 2019).

[48] Def.'s Sur-Rebuttal Closing Argument 28.

[49] U.S. CONST. amend. IV.

[50] Revised Organic Act of 1954, § 3, 48 U.S.C. § 1561, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 159-60 (1995 & Supp. 2013) (preceding V.I. CODE ANN. tit. 1); *see also People v. Smith*, 49 V.I. 229, 234 (V.I. Super. Ct. 2008).

[51] *People v. Samuel*, SX-09-CR-556, SX-09-CR-557, 2010 V.I. LEXIS 80, at *8 (V.I. Super. Ct. Nov. 12, 2010) (unpublished) (citing *Horton v. California*, 496 U.S. 128, 133 (1990)).

evidence is suppressed.[52] The purpose of the exclusionary rule is to "deter Fourth Amendment violations by law enforcement officers."[53] Further, "the exclusionary rule 'is not an individual right and applies only where it result[s] in appreciable deterrence.'"[54]

¶56    However, warrantless searches may be considered reasonable if there is consent, or probable cause and exigent circumstances, or certain exceptions for automobile searches.[55] One such exigent circumstance may be police responding to imminent danger to themselves (sometimes called the "police safety" exception) or others (sometimes called the "emergency aid" exception or doctrine).[56] Additionally, if a warrant is subsequently found to be invalid, the exclusionary rule may not apply under the "good faith exception" to the exclusionary rule: "the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."[57] That a judge issued a warrant usually suffices to establish good faith, but there are exceptions, including when "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."[58]

¶57    The Virgin Islands Rule of Criminal Procedure 4-1 states that a court "may" consider "information communicated by telephone or other reliable electronic means when reviewing an information or deciding whether to issue a warrant or summons."[59] If the court considers this information, "[t]he judge must place under oath—and may examine—the applicant and any person on whose testimony the application is based."[60] In the event the information is relayed orally, the judge must "(i) have the testimony recorded verbatim by an electronic recording device, by a court reporter, or in writing; (ii) have any recording or reporter's notes transcribed, have the transcription certified as accurate, and file it; (iii) sign any other written record, certify its accuracy, and file it;

---

[52] *People v. Walters*, No.: ST-16-CR-31, 2017 V.I. LEXIS 165, at *3 (V.I. Super. Ct. Dec. 4, 2017) (citing *People v. Santana*, 63 V.I. 25, 29 (V.I. 2014)) ("The exclusionary rule, as explained by the V.I. Supreme Court, stands for the principle that 'evidence obtained through unreasonable searches and seizures is excluded from use in criminal prosecutions.'").

[53] *Stone v. Powell*, 428 U.S. 465, 479 (1976) (quoting *Kaufman v. United States*, 394 U.S. 217, 224 (1976)) ("[T]he exclusion of illegally seized evidence is simply a prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers.").

[54] *People v. John*, 52 V.I. 247, 261 (V.I. 2009) (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)).

[55] *Simmonds v. People*, 53 V.I. 549, 560 (V.I. 2010) (citing *United States v. Karo*, 468 U.S. 705, 717 (1984)) ("[A] warrantless search or seizure within the back yard was 'presumptively unreasonable' absent Simmonds' consent or exigent circumstances").

[56] *United States v. Thomas*, Criminal No. 2008-0020, 2009 U.S. Dist. LEXIS 13395, at *19 (D.V.I. Feb. 18, 2009) (citing first *United States v. Burton*, 193 F.R.D. 232, 241-242 (E.D. Pa. 2000); then citing *Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir. 1996); then *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967); and then *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)) ("However, certain circumstances can excuse the warrant requirement, including exigent circumstances, police safety, and consent to the search by one with the power to give such consent."); *Thomas v. People*, 63 V.I. 595, 606 (V.I. 2015) ("Officer John clearly had a right to enter and search Thomas's apartment for the limited purpose of rendering aid without a search warrant because of the exigent circumstances.").

[57] *John*, 52 V.I. at 261.

[58] *Id.* (citing *United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002)).

[59] V.I. R. CRIM. P. 4-1(a).

[60] V.I. R. CRIM. P. 4-1(b)(1).

and (iv) make sure that the exhibits are filed."[61] Further, "[t]he applicant must prepare a proposed duplicate original warrant or summons, and must read or otherwise transmit its contents verbatim to the judge."[62]

¶58    Then, "[i]f the applicant reads the contents of the proposed duplicate original, the judge must enter those contents into an original warrant or summons. If the applicant transmits the contents by reliable electronic means, the transmission received by the judge may serve as the original."[63] Finally, for the warrant to be considered "issued," the judge must "(A) sign the original documents; (B) enter the date and time of issuance on the warrant or summons; and (C) transmit the warrant or summons by reliable electronic means to the applicant or direct the applicant to sign the judge's name and enter the date and time on the duplicate original."[64] Lastly, the rule states that it is not grounds to suppress evidence simply because it may be reasonable to obtain a warrant through non-telephonic means.[65]

¶59    Recently, in *People v. Glasford*,[66] this Court had an instance of a procedurally defective telephonic warrant. Two (2) VIPD detectives were investigating an armed assault with a firearm.[67] The two (2) detectives called and applied for a telephonic warrant to arrest one of the suspects and search an apartment.[68] The Magistrate Judge found probable cause and issued the warrant.[69] However, the Magistrate Judge, although he attempted to record the call, had technical issues and did not properly record the call.[70] Notably, however:

> During Glasford's initial hearing on July 6, 2020, Magistrate Carr announced that his recording device malfunctioned during the detectives' call applying for telephonic warrants, and as a result the call was not recorded. Magistrate Carr further stated that both detectives had been placed under oath and that the telephone conversation on July 4 included essentially what is set forth in the officers' affidavit in support of the warrant. Magistrate Carr prepared written notes of the details of the phone call, dated July 8, 2020 and admitted as part of People's Exhibit M-1. The notes state that Magistrate Can found sufficient evidence that a crime had been committed and that Glasford was the individual who committed that crime.[71]

¶60    One of the detectives also admitted to procedural failings because "he failed to complete the return attached to the warrant and that he never provided a physical copy of the warrant, or an

---

[61] V.I. R. CRIM. P. 4-1(b)(2)(B).

[62] V.I. R. CRIM. P. 4-1(b)(3).

[63] V.I. R. CRIM. P. 4-1(b)(4).

[64] V.I. R. CRIM. P. 4-1(b)(6).

[65] V.I. R. CRIM. P. 4-1(c).

[66] 2022 VI Super 42.

[67] *Id.* at ¶2.

[68] *Id.* at ¶12.

[69] *Id.*

[70] *Id.* at ¶16.

[71] *Id.*

inventory of items taken or searched to Xavier, following the search of her apartment."[72] Further, both detectives were able at the suppression hearing to give detailed testimony of the evidence they had collected against the suspects and what evidence they specifically relayed over the phone to the Magistrate Judge.[73]

¶61     However, despite the Magistrate Judge's  failure to record the telephonic warrant conversation, and the officers' failure to complete the return attached to the warrant, provide a physical copy, and an inventory, this Court did not suppress the evidence. This Court found the failure to read verbatim or transmit an exact copy of the warrant to be a harmless error.[74] Looking to the District Court of the Virgin Islands for guidance, this Court also stated that failure to perfectly adhere to the procedural rules does not always necessitate suppression.[75] Importantly, the Court cited the Magistrate Judge's statements from the bench as the basis for its reasoning that the procedural violations did not warrant suppression as there was clear evidence about what the Magistrate Judge was told and what his finding of probable cause was based upon:

> Even though the court failed to record the telephone call, Magistrate Carr stated from the bench that he attempted to record the call, that the information provided by Detectives Bedminster and Phipps on July 4, via telephone, was "essentially" the same as the information provided within the probable cause affidavit, and from those facts the magistrate found sufficient probable cause to issue the warrants. The Court cannot identify any clear prejudice against Glasford, as the deficiencies of the telephonic warrant process were technical failures of procedure. Accordingly, the Court finds that Glasford has not carried his burden, as the movant, to prove there was a clear constitutional violation.[76]

## III.    ANALYSIS

### A. The "oral search warrant" was invalid

#### 1.  The "warrant" was so deficient as to be obvious on its face

¶62     The Virgin Islands Rules of Criminal Procedure allow, though do not require, the Court to consider information communicated by telephone or other electronic means.[77] Should the Court choose to issue a warrant this way, there are a series of procedures, some of which "must" be done and some of which "may" be done.[78] The first is that the applicant *must* be placed under oath.[79] In

---

[72] *Id.* at ¶18.

[73] *Id.* at ¶17.

[74] *Id.* at ¶29.

[75] *Id.* at ¶27.

[76] *Id.* at ¶29.

[77] V.I. R. CRIM. P. 4-1(a) ("The court may consider information communicated by telephone or other reliable electronic means when reviewing an information or deciding whether to issue a warrant or summons.").

[78] *E.g.*, V.I. R. CRIM. P. 4-1(b)(1) ("The judge must place under oath—and may examine—the applicant and any person on whose testimony the application is based.").

[79] *Id.*

the instant case, the sole applicant, Griffith, testified that he did not remember if he was placed under oath. The Search Warrant that was prepared the day after the search does not indicate anywhere on its face on in annotation that the applicant was placed under oath. Nor does it contain on its face what particular crime the search warrant was being executed in relation to.

¶63    The Search Warrant does indicate that the judge reviewed "the facts presented before me by the Affidavit of Sgt. Dwight A. Griffith." An Affidavit In Support Of A Search Warrant signed by Griffith is included, which states that the Affidavit was subscribed and sworn before the Judge on May 28, 2019. A note at the bottom of the warrant, purported by the People to be written by the Judge, but with no indication such as a separate signature or initial, states "information previously conveyed by telephone under oath by Sgt. Dwight A. Griffith on May 27, 2019, at @ [sic] 1:30 P.M." The Search Warrant thus clearly incorporates an affidavit made under oath the day *following* Griffith's call. The issues that must be addressed are  whether: (1) a hand written annotation of uncertain provenance alluding to unspecified information on an affidavit is sufficient to establish that Griffith was under oath at the time of the call and (2)  the facts as laid out in the affidavit are the verbatim facts Griffith conveyed to the Judge, as well as whether this *post-hoc* procedure is sufficient to satisfy the requirements of Rule 4-1 to mean that a warrant was "issued" on May 27.

¶64    A comparison to the facts of *Glasford* is illuminating. There, the judge himself stated he placed the detectives under oath, and affirmatively stated that the facts conveyed were "essentially" the same as occurred in the affidavit. Further, the detectives testified in detail about what they told the judge on the phone, and their testimony tracked with the affidavit. Here, Griffith testified that he could not remember what he told the judge on the phone or what he was asked or even if he was placed under oath. Further, there are no statements by the judge that he placed the detectives under oath or that the information was "essentially the same." While there may be situations where a procedural failure is minor or is later cured by evidence and testimony, such as in *Glasford*, that is not the case here.

¶65    Rule 4-1(b)(2)(B) requires that testimony given telephonically be recorded by a recording device, court reporter, or in writing.[80] Plainly, no such recording or writing exists. Again, a comparison to *Glasford* is enlightening. There the Magistrate Judge still attempted to record, but failed due to technological problems, and he stated this from the bench. Further and more importantly, the Magistrate Judge took cotemporaneous notes, which were filed by the People as exhibits in that case. No such recording or even attempt at recording, and no such cotemporaneous writing exists here to cure the failure. There is not even testimony from an accompanying officer as to what Griffith stated on the phone, as Griffith made the call alone in his car without another officer. Instead, the Court is presented with a valid search warrant issued May 28, the day after the search, and a phone call which relayed uncertain information, made the day of the search.

¶66    Warrants serve to ensure a neutral judge has evaluated the reasonableness of an intrusion into a person's private sphere, to constrain the search and seizure of private property and people

---

[80] V.I. R. CRIM. P. 4-1(b)(2)(B)

to legitimate ends, to prevent hindsight from coloring the reasonableness of a search or seizure, to alert the person who is, or whose property is, being seized as to the scope and authority of state agents, and to otherwise constrain the state from engaging in indiscriminate, arbitrary, or biased harassment of its people. Accordingly, procedures for obtaining a warrant are crafted to serve these ends, not as mere bureaucratic hoops to jump through with no purpose. While there are times when procedural errors are harmless or curable, that does not justify a wholesale abandonment of the procedures. While a warrant may be obtained using the telephone, a telephone call is not a warrant. A reasonable officer would know that 'I called a judge he said we could go in' are only words, not a warrant.

¶67    Does the fact that a valid warrant was issued the following day cure the invalid "search warrant phone call?" It appears to this Court that the answer should be "no." The United States Supreme Court has oft stated that one purpose of the warrant requirement "is to prevent hindsight from coloring the evaluation of the reasonableness of a search or seizure."[81] Plainly, a search warrant prepared and executed following the search is tainted by hindsight. Courts have also stated that "[t]he purpose of the accompanying affidavit clarifying a warrant is both to limit the officer's discretion and to inform the person subject to the search what items the officers executing the warrant can seize."[82] Again, a search warrant made after the search and after items have already been seized neither limits an officer's discretion in anyway nor does it inform a person what items the officers may seize, as items have already been seized. That VIPD seized over sixty (60) items, many of which are not the single firearm seen in the video or the single firearm described in the warrant, including many noncontraband items without any conceivable relation to the shooting, such as a "Kmart tag," a social security card, a black box that contained "miscellaneous items," and loose currency from a child's bedroom, underscores the deep disconnect between the warrant requirements purpose, and what occurred in the instant case.

¶68    Further, while Rule 4 of the Virgin Islands Rules of Criminal Procedure currently states under the "Time Limit" section that the section is "[Reserved],"[83] other jurisdictions require that warrants be executed within a certain time *after* the warrant has been issued.[84] Thus, while the Virgin Islands Rules of Criminal Procedure do not yet limit how many days VIPD has to execute a warrant, that other jurisdictions' time limits state that the warrant must be executed within a certain time *after* issuance, bolsters the understanding that the search warrant must exist *before* the search. Therefore, while the People argue that there is nothing in the rules that explicitly requires *when* the procedures be followed and the warrant be created, and thus issuing the warrant at any time, including a day after the search, is allowed, it is plain that this understanding is erroneous.

---

[81] *United States v. Martinez-Fuerte*, 428 U.S. 543, 565 (1976).

[82] *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986).

[83] V.I. R. CRIM. P. 4(c)(3).

[84] *E.g., New Mexico v. Sanchez*, 476 P.3d 889 (N.M. 2020) (Rule 5-211(C) of the New Mexico Rules of Criminal Procedure for the District Courts requires a warrant be executed within 10 days after it is issued); *State ex rel. Two Unnamed Petitioners v. Peterson*, 866 N.W.2d 165, 247 (Wis. 2015) (Wisconsin Statute § 968.15 requires a search warrant be executed within 5 days after it is issued).

¶69    Lastly, to permit a *post-hoc* warrant created after the search to substitute for the phone call in this case would render most, if not all, of Rule 4-1 as null and extraneous. This is not a situation where there was simply a scrivener's error or inartful drafting or the execution of a seemingly valid warrant premised on a false affidavit. There can be no "good faith" reliance on a warrant that was not even made until the following day. No indicia of probable cause or parameters to constrain the searching officers can exist on a document not yet drafted. The other officers executing the warrant are essentially just relying on hearsay that one of the officers called a judge and he said there was probable cause. The requirements for obtaining a telephonic warrant plainly and clearly envision a cotemporaneous record and even helpfully offer several methods to create this record, including sending a draft warrant to the judge, taking a transcription, or even just simply pressing "record" on the phone. What they do not state is that a call alone is enough. A reasonable officer should know that a phone call is not enough to satisfy the Fourth Amendment.

### 2. There was not a valid "police safety" exigent circumstance exception here

¶70    The People argue in the alternative that exigent circumstances justify entry into the apartment because there could have been an armed shooter and the officers did not know who was in the apartment. However, no testimony or evidence was proffered that at any point any VIPD officer believed there might be an armed shooter. Rather, evidence was offered that shortly after the shooting, VIPD officers secured the scene. Evidence was offered that VIPD set up police tape around the premises were openly placing evidence markers by spent casings. Further, Griffith testified he reviewed the surveillance footage with the landlady and a technician in a room below the apartment.

¶71    The video surveillance footage plainly shows the occupants of the home—a family consisting of Warrell, Jerez, and their children—all rushing out into a car shortly after the shooting, and Griffith had made contact with Warrell and the other apartment occupants at the hospital. It also plainly showed that Warrell was attacked by gunmen outside his home, he was the only person to return fire, and those gunmen fled, so there was no indication of any other gunmen waiting or firing from inside the apartment. Lastly, Griffith called the judge around 1:30 in the afternoon, many hours after the police had arrived at the scene. Clearly, if VIPD officers felt secure enough to wait outside for many hours, put up police tape, and mark evidence, they did not have a belief that they might be in danger from an armed occupant. The "police safety" exigent circumstance exception is clearly inapplicable to this case.

### B. The absence of a valid warrant necessitates the application of the exclusionary rule in this case

¶72    As stated above, the Virgin Islands Supreme Court has recognized that application of "the exclusionary rule 'is not an individual right and applies only where it result[s] in appreciable

deterrence.'"[85] The instant case is one where suppression is appropriate to ensure that the constitutional rights of all Virgin Islanders and visitors are respected. Warrell was the victim of an attack who was not accused of any crime, yet police confiscated his apartment keys and obtained a search warrant because, in Griffith's testimony, a minor had removed the gun from the driveway and put it upstairs in the apartment. While Griffith also testified that he knew Warrell had more guns from the video, Griffith did not testify that those guns were suspected to be illegal or that Warrell was the aggressor. He affirmatively stated Warrell was a victim, not a suspect, and that the reason he wanted to enter the apartment was that a minor had "removed evidence." More importantly, the search warrant plainly makes reference to "a firearm," not firearms.

¶73    This is precisely why a cotemporaneous recording or transcription is called for in the rules. The Court has no way of evaluating what Griffith relayed to the Judge on the phone, but from the evidence, circumstances, and face of the warrant, it appears to be that the warrant was for the firearm that was used to shoot Warrell, who is, as Griffith testified, still a victim. That the minor thought it prudent to move a loaded gun out of a street following a shootout hardly seems like it would necessitate police confiscating someone's apartment keys and deciding to first seize and search the house and not just ask the victim. While the Court makes no findings on whether a warrantless search occurred in the morning of May 27, 2019, prior to Griffith's call with the judge, the allegations and testimony are disturbing. The inventory of items seized indicates a search that went far beyond that of a firearm hastily put inside an apartment, including into children's rooms, drawers, and beds. Further, it appears a significant sum of money was taken from the apartment that was, initially, not clearly and distinctly marked and accounted.

¶74    Most important would be the effect of not suppressing the evidence. To not suppress the evidence would condone this behavior, effectively jettisoning all of Rule 4-1 into irrelevance. If all the police have to do is get an oral "okay" from a judge, with no record, and then type up a warrant some days later, why go through the effort of ever obtaining a warrant? To not suppress the evidence here would set the precedent that this is an acceptable method of conducting searches and seizures.

¶75    A rise in searches of this nature would also likely lead to a corresponding rise in suppression motions and hearings. Any reasonably competent defense attorney would challenge a "search warrant" that did not comply with Rule 4-1. This would take up the Court's resources, the time and resources of the Department of Justice, the time and resources of VIPD, and delay the ultimate resolution of a defendant's case, with no discernible benefit. Further, one benefit of the warrant procedures is they provide a clear evidentiary record of the legality and reasonableness of a search. Without this record, the Court would be forced into the position of constantly assessing the testimony and credibility of VIPD officers and others.

---

[85] *People v. John*, 52 V.I. 247, 261 (V.I. 2009) (quoting *Herring v. United States*, 555 U.S. 135, 141 (2009)); *see also United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir. 2002) (internal quotations and citations omitted) ("By excluding evidence seized as a result of an unconstitutional search and seizure the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused.")

¶76     Acquiring a warrant in modern America has never been easier, and technology has made the task even quicker, more reliable, and nearly instantaneous. The requirements of Rule 4-1 are not onerous, and indeed, they offer multiple ways of being satisfied. While there may be contexts or situations where errors or a failure to fully abide by them may be excused, or otherwise cured such as in *Glasford*, they are *still* requirements. Accordingly, the Court will suppress all evidence seized from the apartment at 70-B Solberg on May 27, 2019. Of course, any contraband or illegal items seized from Warrell will remain with the VIPD. Lastly, while Rule 4-1(c) does limit when evidence may be suppressed, the rule states: "Absent a finding of bad faith, evidence obtained from a warrant issued under this rule is not subject to suppression on the ground that issuing the warrant in this manner was unreasonable under the circumstances."[86] In the instant matter, the grounds for suppression is not that obtaining a telephonic warrant was unreasonable under the circumstances. The Motion will be granted because the "telephonic warrant" was so facially invalid that there could be no good faith reliance on it and because a written warrant was not issued until the following day.

### C. Because the "oral search warrant" was invalid and so facially defective a reasonable officer should not have relied on it, the Court need not reach the issue of whether there was a prior warrantless search of the house

¶77     As the evidence will be suppressed, the Court does not need to decide whether or not there was a warrantless search of the apartment prior to Griffith's call with the judge. The Court, therefore, need not also address whether the independent source doctrine would "cure" a defective warrant acquired after an unconstitutional search. However, because Warrell argued and presented evidence on the issue of whether VIPD entered the apartment prior to Griffith contacting the Judge, the Court will summarize the evidence and arguments presented here and establish its findings for the record.

¶78     Jerez testified that she was at home with her kids when the shooting occurred, she gathered her kids, and when the shooting stopped, she fled with her kids—a teenaged boy, a young girl, and a baby, wearing little more than sleeping shirts—to take Warrell to the hospital. Jerez testified that at the hospital, she was given the money from Warrell's pockets but not the keys to her apartment by a CST officer. Jerez testified that because her kids were cold, wearing little beyond pajamas, and she needed items to care for her young baby, she returned home, but was prevented by Griffith from entering her home. She further testified that Griffith stated he would call her when it was okay to reenter the home, but he never did.

¶79     Jerez then testified that eventually she prevailed on another VIPD officer, "Kim," that she needed to enter her home to get items for her baby and the officer escorted her back to her home that morning. Without keys, Jerez testified that she had to prevail on her landlady, Hairston, to let her in. Hairston testified that she did indeed let Jerez into the home that morning. Jerez stated upon entering the home, the place was ransacked, many items were missing, and the apartment was not in the same state as when she left it. Griffith testified that he received the apartment keys from a

---

[86] V.I. R. CRIM. P. 4-1(c).

CST officer. The People played as evidence a surveillance video that shows Jerez and her young kids, wearing little nightwear, hurriedly fleeing into a car with Warrell. The People offered no counter to this testimony, nor did they provide an alternative explanation or accounting of events except to impugn the credibility of Jerez and Hairston as innately biased and self-serving.

¶80     That a parent of a newborn who hastily fled from her house would need to return home to retrieve items for her baby and kids is sensible, and that Jerez was relieved of her apartment keys and would then need assistance to enter the apartment, is established not just by her and Hairston's testimony, but Griffith's, who stated he received the apartment keys from a CST officer. Further, Jerez's account of missing items and the state of her house did not appear uncredible or a fabrication to the Court. While Warrell voiced complaints that VIPD only copied the shootout from the surveillance video and did not preserve video of when officers entered the apartment, and while such video may have been useful in resolving the matters at hand, the Court does not view this as necessarily intentional or indicative that there was or was not a prior warrantless search. The evidence and arguments so considered, the Court finds Jerez and Hairston's testimony to be credible.

## IV.    CONCLUSION

¶81     On May 27, 2019, Warrell was ambushed by gunmen while returning home late at night resulting in a firefight and Warrell getting shot. The gunmen fled and Warrell was transported to the hospital by his partner, Jerez, along with her two (2) children and a newborn. The hospital reported to VIPD that there was a gunshot victim and VIPD responded to the hospital, then to the scene of the shootout to secure it. VIPD also retrieved Warrell's apartment keys from a nurse who had removed his pants. While gathering evidence at the scene, Griffith reviewed surveillance footage of the shootout which showed one of the gunmen dropping his gun, and the teen son of Jerez picking it up out of the street and carrying it up the stairs into the apartment as Warrell and the rest of the family were entering the car.

¶82     On the basis of this video, Griffith testified that, while he was alone in his car, he called the Judge and that it was orally relayed to him that a warrant would be issued. No prior draft warrant or affidavit was prepared and read, nor was a transcript or recording of this call made. Griffith could not recall if he was placed under oath or exactly what he relayed. The judge did not sign and transmit an original warrant until the following day. Griffith and VIPD officers then conducted a search of the apartment, seizing a wide variety of weapons, ammunition, drugs, paraphernalia, money, miscellaneous documents and items such as keys, boxes, bags, cards, and so forth. The following day, a search warrant was signed and issued "For evidence of the crime, to include but not limited to: a firearm" and its various parts. The Search Warrant, signed and dated May 28, 2019, contained annotation at the bottom stating "warrant issued by telephone on May 27, 2019 at @[sic] 1:30 P.M."

¶83     This Court finds that this annotation was not sufficient to turn the "oral search warrant" granted the day before into the valid search warrant signed and issued the following day. The Virgin Islands Rules of Criminal Procedure proscribe particular requirements for the issuance of a

telephonic warrant, most or all of which were not met, or even attempted to be met, before the search, and the failure to meet them was not cured by any testimony or evidence filed or provided at the hearing, as opposed to other similar cases. Further, in analyzing the purpose of the warrant requirement and the effect allowing a *post-hoc* rubber-stamping of warrants obtained in violation of Rule 4-1 would have on persons' constitutional rights, policing, and the criminal justice system, the Court concludes that suppression is appropriate here. Warrell also submitted evidence is support of his argument that VIPD engaged in a warrantless search and seizure of his apartment prior to Griffith calling the judge. However, because the Court finds that the "oral warrant," which was essentially an officer relaying his conversation with a judge, was so lacking in particularity and indicia of probable cause on its face, that no reasonable officer should have relied on it.

An Order consistent with this Memorandum Opinion follows.

DATED: June **22**, 2022

**DENISE M. FRANCOIS**
Judge of the Superior Court of the Virgin Islands

**ATTEST**:

**TAMARA CHARLES**
Clerk of the Court

BY:
for **LATOYA CAMACHO**
Court Clerk Supervisor 06/23/2022